UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

**Joseph Anthony Reyna (JoeCat®),**

Plaintiff, Pro Se,

v.

**Sean Combs,**

Defendant.

Case No. 1:25-cv-09608

---

**PLAINTIFF'S SUPPLEMENTAL NOTICE REGARDING DIGITAL-EVIDENCE PRESERVATION AND FORESEEABLE SPOLIATION RISKS ARISING FROM DEFENDANT'S MULTI-DECADE CATALOG MIGRATIONS AND DATA-ADMINISTRATION SYSTEMS**

*(No Relief Requested Beyond Preservation)*

Plaintiff respectfully submits this Supplemental Notice to assist the Court in exercising its inherent authority to ensure the preservation of relevant digital evidence.

Although this action is already pending, Plaintiff uses the **Rule 27** framework solely as an *organizational structure* for the issues discussed herein. The legal basis for preservation is the

Court's inherent authority and its discretion under **Rules 16, 26, and 37** of the Federal Rules of Civil Procedure.

This filing:

- seeks no discovery,

- alleges no wrongdoing by non-parties,

- requests no sanctions, and

- asks the Court to draw no negative inference from any historical patterns described.

The historical and structural patterns referenced below are cited **solely** to demonstrate the **foreseeability of digital evidence loss**, consistent with the logic of *Zubulake* and *Silvestri*.

---

## I. CLARIFICATION TO THE COURT (PRECONCEPTION-DISARMING STATEMENT)

Plaintiff acknowledges that Defendant **Sean Combs** has a long and highly public professional history that has been the subject of substantial media, litigation, and documentary attention.

This filing:

1. **Does not** ask the Court to evaluate or adjudicate that history;

2. **Does not** allege character or propensity;

3. **Does not** seek to introduce Rule 404(b) "other acts" evidence for a forbidden purpose; and

4. Offers the structural patterns described below strictly for a **Rule 403–permitted purpose**:

   to show the foreseeability of evidence instability and the vulnerability of relevant digital records.

No allegation of criminal conduct, moral fault, or historical liability is sought or required for the limited procedural relief implied here: **preservation only**.

---

## II. STRUCTURAL PATTERNS RELEVANT TO DIGITAL-EVIDENCE PRESERVATION

Plaintiff summarizes below neutral, systemic, legally admissible patterns that have emerged from public records, industry history, and Plaintiff's experience. These patterns are **industry-wide,**

**structural, and non-accusatory**, but they intersect directly with Defendant's unique

professional footprint and the kinds of digital systems implicated in this case.

## A. Multidecade Digital Migration Instability

Defendant's catalog, business ventures, and associated rights have passed through multiple eras

of computing and distribution, including:

- analog-to-digital conversion;

- early MP3 ingestion and primitive digital libraries;

- major-label distribution migrations and joint-venture changes;

- metadata restandardization (e.g., evolving ID3, CWR, DDEX norms);

- rights-management software redesign and vendor changes;

- repeated catalog re-ingestion by digital service providers (DSPs) such as Spotify, Apple, and YouTube;

- database schema rebuilds and API upgrades;

- international catalog bifurcation and territory-specific variants.

Each migration presents inherent, non-accusatory risks of:

- overwritten metadata histories;

- lost or truncated authorship timestamps;

- altered project identifiers and catalog numbers;

- reset or reinterpreted visibility flags and priority markers;

- playlist-history erosion as systems are redesigned;

- royalty-routing reconstruction errors when schemas change;

- loss of deprecated fields that are no longer supported by new databases.

These are **technical inevitabilities** in dynamic systems, not allegations of misconduct. They directly support the foreseeability of digital evidence loss absent clear preservation.

---

## B. Narrative Instability Across Institutions

Public records, documentary reporting, archival journalism, and litigation history involving Defendant's professional environment show recurring features:

- inconsistent or evolving accounts of past events;

- incomplete or missing documentation for key periods;

- witnesses later modifying, softening, or withdrawing earlier statements;

- investigations yielding fragmented or non-centralized records;

- institution-level gaps in archival continuity;

- post-hoc reinterpretation of prior incidents as new information surfaces.

Plaintiff does **not** ask the Court to decide which accounts are accurate. The narrow point is:

Historical narratives involving Defendant's professional world have **repeatedly lacked stable documentation**, making future loss of digital evidence reasonably foreseeable in any matter requiring reconstruction of past states.

---

**C. Structural Incentives Toward Information Control**

Across the commercial music and entertainment ecosystem, the following **structural realities** exist, none of which allege misconduct by any specific party:

**Commercial incentives**

- Protect catalog valuations and perceived IP stability;

- Avoid liability exposure from older contracts or contested attributions;

- Maintain consistent public narratives surrounding legacy acts and brands.

**Institutional incentives**

- Promote clarity and predictability for investors, catalog purchasers, and financial partners;

- Minimize public controversy and reputational volatility;

- Preserve brand identity and long-term market confidence.

**Operational incentives**

- Consolidate historical records into "clean" canonical versions;

- Deprecate older systems and discard data deemed "non-essential";

- Rewrite or normalize metadata during catalog migrations to meet current technical standards.

In such an environment:

Conflicting, granular, or inconvenient historical data is **structurally disfavored** and not strongly incentivized to survive, even without any intent to destroy evidence.

This general architecture increases the risk that earlier digital states relevant to Plaintiff's claims will be lost or overwritten unless preserved now.

---

### D. Posthumous and Estate-Economics Logic

## Supplemental Illustration from Public Reporting (Funeral Accounting Dispute)

Public reporting and documentary interviews, including statements attributed to Bad Boy co-founder Kirk Burrowes, describe historical disputes concerning how posthumous expenses were categorized in connection with the late Christopher Wallace ("The Notorious B.I.G."). According to outlets such as *Business Insider* and *Complex*, Burrowes has asserted that the cost of Wallace's funeral was treated as a recoupable label expense rather than an external tribute cost. Under standard industry accounting practices, any cost categorized as a label expenditure may reduce an artist's future royalty earnings or the value transferred to the artist's estate.

This Court is not asked to make any finding regarding the accuracy of those statements. They are referenced solely to illustrate the following structural principle:

**When label, management, or executive entities exercise both commercial and narrative control surrounding an artist's death, financial recordkeeping may become intertwined with public-image imperatives, making contemporaneous documentation especially vulnerable to later reinterpretation or loss.**

The reporting further describes contemporaneous disputes concerning proposed contract revisions and internal disagreements about how posthumous intellectual-property rights should be administered. Those matters appear in the public record not as adjudicated facts but as examples of:

- the complexity of royalty accounting,

- the opacity of recoupment classification,

- the volatility of estate-related financial records, and

- the historical difficulty in reconstructing accurate lineages of metadata, expenses, and rights after the fact.

For preservation purposes, these accounts demonstrate one point only:

**Historical financial and administrative records within Defendant's professional environment have, at times, been the subject of conflicting accounts, disputed classification, or narrative instability, which heightens the foreseeability that digital evidence may be lost, altered, or overwritten absent a preservation directive.**

No wrongdoing is alleged.

The structural environment is what matters.

---

### E. Executive Gatekeeping + Market Participation Conflict (Structural Form Only)

Plaintiff's research identified patterns—across the industry generally—where individuals or entities:

- control or strongly influence **visibility systems** (playlists, marketing, prioritization, internal "priority artist" lists);

- participate as **market actors** within those same systems;

- shape promotional, discovery, and resource-allocation logic;

- benefit from internal decisions about which projects are emphasized, delayed, demoted, or silently deprioritized.

Without asserting that any such conduct has occurred here, Plaintiff notes:

When decision-makers also function as market participants, there is inherent structural pressure on digital systems, including **metadata prioritization, catalog positioning, and visibility logic**.

Given Defendant's longstanding combination of executive, entrepreneurial, and creative roles, this structural pattern heightens the foreseeability that **digital records touching his catalog and related ecosystems may be unusually dynamic, frequently touched, and thus at elevated risk of loss** unless preserved.

---

## F. Institutional Adjacency and Public-Image Architecture

Throughout his career, Defendant has operated in proximity to:

- major-label corporate structures and distribution partners;

- philanthropic, civic, and political partnerships;

- prominent media organizations;

- high-profile brand ventures and advertising campaigns;

- joint-venture entities and cross-promotional collaborations.

These alignments are not accusations. They simply illustrate a well-known dynamic:

When multiple institutions rely on a **unified public narrative** for commercial or reputational reasons, there is pressure to harmonize records over time, sometimes at the expense of preserving older, conflicting, or more granular versions.

This harmonization logic, extended into digital systems, increases the risk of overwritten data states and missing historical detail if preservation is not clarified early.

---

### G. "Retractive Environment" Pattern (Neutral Framing)

Plaintiff's research into the music industry reveals what can fairly be described as a **retractive environment**, where:

- statements may be revisited or reframed in later interviews;

- accounts may be softened, contextualized, or withdrawn;

- reporting may be edited, archived, paywalled, or removed;

- past narratives may be overshadowed by later "official" versions;

- earlier documentation may not survive corporate reorganizations or ownership changes.

This filing expresses no view on the motives or credibility of any participant in that environment. The narrow, procedural point is:

Systems surrounding high-profile figures often produce **unstable historical records**, which is directly relevant to the question of whether digital evidence will survive absent explicit preservation.

---

**H. From Physical Harm and Fear to Digital Suppression (Structural Continuity)**

Historically, the commercial music space has featured episodes where:

- violence, fear, and intimidation impacted who felt safe challenging contracts or demanding transparency;

- high-profile incidents and tragedies resolved without a full public evidentiary record;

- institutional actors appeared hesitant to fully probe corporate structures behind cultural conflict.

In the digital era, the **means of control have changed**:

- instead of physical coercion, there is the ability to invisibly adjust **metadata, rankings, visibility, and routing**;

- instead of overt exclusion, there can be silent **downranking or non-surfacing**;

- instead of obvious paper trails, there are **ephemeral logs and schema-dependent data**.

Without assigning blame, Plaintiff's central structural contention is:

The same ecosystem that historically tolerated opacity and under-investigation in the physical and contractual domains now operates heavily through **software and data**, making digital suppression a quieter, but foreseeable, evolution of older patterns.

That evolution makes **preservation of digital histories** not speculative but structurally necessary.

---

## III. FORESEEABILITY LOGIC AND THE INHERENT CATCH-22 OF DIGITAL-SYSTEM VOLATILITY

The Court's inherent preservation authority is triggered when evidence is at risk of alteration or loss. Here, any position Defendant could take regarding the stability of the relevant digital evidence independently confirms the need for preservation. The logic is self-reinforcing:

1. **If Defendant were to assert that the relevant digital records are stable and unlikely to change,**
   then preservation imposes minimal burden and should be ordered as a matter of routine judicial prudence.

2. **If Defendant were to assert that the relevant records are dynamic or regularly updated,**

   that admission establishes the precise type of foreseeable spoliation Zubulake and Silvestri require courts to prevent.

3. **If Defendant were to contend that industry systems are historically reliable and self-correcting,**

   the Court may contrast that assertion with decades of public documentation showing the opposite trend, thereby reinforcing the need for preservation.

4. **If Defendant were to acknowledge that entertainment-industry systems are historically unstable, fragmented, or prone to record loss,**

   that acknowledgment directly supports Plaintiff's position that preservation is warranted.

Accordingly:

**Every conceivable defense position confirms the necessity of a preservation directive.**
The factual predicate for preservation is therefore not adversarial; it is structural. The risk of future evidentiary loss exists regardless of intent, and the Court's authority under Rules 16, 26, 37, and its inherent power is properly invoked to ensure stability pending full discovery.

---

## IV. PARTICULARITY: EVIDENCE TO BE PRESERVED

To satisfy the requirement of reasonable particularity, Plaintiff identifies the following categories of records related to Defendant, his catalog, and any works or records intersecting with Plaintiff's claims:

1. **Authorship timestamps**

    ○ Creation, registration, and contribution timestamps for musical works, sound recordings, compositions, and related assets.

2. **Contribution histories**

    ○ Credits and role designations (writer, producer, performer, etc.), including prior or edited versions.

3. **Metadata edit logs**

    ○ Logs or version histories documenting changes to titles, credits, ISRC/ISWC assignments, ownership fields, and associated descriptive data.

4. **ISRC/ISWC lineage**

   ○ Assignment histories, reassignment logs, and reuse of codes that could affect tracking and attribution.

5. **Royalty-routing histories**

   ○ Historical routing tables, payee configurations, and schema versions governing how revenue was directed over time.

6. **Playlist inclusion histories**

   ○ Records of inclusion on, and removal from, editorial or algorithmic playlists, including timestamps and any associated priority or promotion flags.

7. **Search-indexing and discovery histories**

   ○ Historical data reflecting searchability, discoverability, and rank in internal or external search and recommendation systems.

8. **Catalog versioning records**

   ○ Version control for releases, reissues, remasters, bundles, and compilations, including prior internal identifiers.

9. **Project-identifier lineage**

   ○ Internal and external project IDs, catalog numbers, and their historical mappings to specific works and releases.

10. **API dissemination logs**

   ○ Logs of catalog, metadata, and rights information transmitted via APIs to third-party DSPs and partners, including push/pull histories.

11. **Rights-management internal notes**

   ○ Internal notes or comments associated with rights, disputes, exceptions, overrides, or special handling of works.

12. **Entries referencing Plaintiff**

- ○ Any records, fields, notes, or tickets referencing Plaintiff by name, alias, catalog, or works, in any system under Defendant's possession, custody, or contractual control.

These categories relate directly to Plaintiff's claims and Defendant's potential defenses concerning:

- attribution and authorship;

- interference and suppression;

- visibility and discoverability;

- commercial harm and royalty flow;

- reconstruction of how relevant digital states evolved over time.

---

## V. SCOPE NARROWING

To avoid any suggestion of overbreadth, Plaintiff emphasizes:

- This Notice does **not** seek a present preservation order directly against:

- major labels;

- distributors;

- DSPs;

- third-party vendors;

- affiliated corporate entities.

- Any references to such entities are included **only** to describe technical pathways through which Defendant's catalog and related data travel.

To the extent third-party entities hold relevant records, Plaintiff understands that:

Any obligations on those entities would be addressed through **separate, proper motion practice**, subpoenas, or subsequent orders, if and when appropriate.

This Notice is directed primarily at evidence within Defendant's **possession, custody, or control**, including via contractual rights to access or direct relevant systems.

---

## VI. IMMINENCE OF LOSS

Routine digital behavior—without any misconduct—creates imminent risk of partial or total loss of relevant evidence, including:

- scheduled **log rotation** and log size limits;

- **schema redevelopment** and database migration;

- **rights migration** to new vendors or platforms;

- **server deprecation** and data center consolidation;

- **DSP-level re-ingestion** or re-processing of catalog files;

- **catalog consolidation** under new ownership frameworks;

- automated **deduplication** and "cleanup" tasks;

- **metadata standardization** that overwrites or obsoletes earlier granular entries.

Federal courts recognize that such routine operations can constitute **foreseeable spoliation** if potentially relevant evidence is not affirmatively preserved once litigation is pending or reasonably anticipated.

Here, given:

- the age and breadth of Defendant's catalog;

- the multiplicity of systems involved; and

- the inherent volatility of the digital environment,

the risk is present and ongoing.

---

## VII. ANTICIPATED DEFENSE ARGUMENTS AND PLAINTIFF'S REBUTTALS

*(Presented narrowly and solely for the purpose of demonstrating why preservation is legally necessary and not burdensome.)*

**Rebuttal 1: "The records are stable and not at risk of loss."**

If Defendant asserts stability, then preservation imposes minimal burden and carries no prejudice.

Courts routinely grant preservation in such circumstances because the directive merely formalizes a condition the party already claims exists.

 See: *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003).

**Therefore:** Stability is an argument *for* preservation, not against it.

---

**Rebuttal 2: "The systems are dynamic and automatically update."**

A dynamic system is, by definition, one with a heightened risk of overwriting prior data states. Automatic updates, ingestion processes, schema migrations, and log rotations are classic triggers for preservation under Rule 37(e).

**Thus:** Any assertion of "ongoing updates" confirms *foreseeable spoliation* and strengthens Plaintiff's request.

---

**Rebuttal 3: "Industry standard practices ensure accuracy."**

Even if Defendant cites industry best practices, decades of publicly documented catalog migrations, metadata rebuilds, ingestion errors, and schema restandardizations demonstrate structural instability across the entertainment sector.

Courts do not assume industry systems are infallible; they evaluate whether loss is *reasonably foreseeable*. The history of digital-media ingestion at multiple DSPs and labels makes that foreseeability undeniable.

**Hence:** Industry practices do not negate preservation; they require it.

---

**Rebuttal 4: "Industry systems are inconsistent and unreliable."**

If Defendant argues the opposite—that industry systems are historically fragmented or unstable—that position directly supports Plaintiff's concern that historical metadata, timestamps, and lineage records could be lost absent judicial intervention.

**Therefore:** Claims of unreliability reinforce the need for preservation.

---

**Rebuttal 5: "Plaintiff's request is overbroad."**

The Notice is explicitly:

- non-discovery,

- non-intrusive,

- time-limited,

- directed only at Defendant, and

- restricted to categories directly relevant to attribution, authorship lineage, visibility, and digital routing.

No third-party obligations are imposed. No subpoenas are requested. No production is sought.

The scope is narrower than those routinely approved in preservation orders across SDNY.

---

**Rebuttal 6: "Preservation imposes undue burden."**

Preservation is substantially less burdensome than production.

Modern enterprise systems already:

- snapshot data,

- maintain backup instances,

- store redundant logs, and

- preserve version histories.

The marginal cost of preserving existing systems is negligible compared to the cost and prejudice of losing evidence.

**Thus:** "Burden" is neither factually nor legally credible.

---

**Rebuttal 7: "Plaintiff is attempting to introduce prejudicial character evidence."**

The Notice:

- does **not** allege wrongdoing,

- does **not** introduce Rule 404(b) evidence,

- cites patterns only as structural indicators of record volatility, and

- expressly disclaims any character-based inference.

All referenced examples serve the limited *Rule 403 purpose* of demonstrating foreseeable instability in digital systems, not propensity.

Courts allow context when it is used to establish the risk of evidence loss, not to establish character.

---

**Rebuttal 8: "Preservation exists automatically; no order is necessary."**

If Defendant contends that "our systems already preserve everything," then a court order merely formalizes what Defendant claims is already occurring.

Courts issue preservation orders precisely to avoid future disputes regarding:

- scope,

- retention duration,

- overwritten logs,

- system migrations, or

- inadvertent deletions.

The order protects **both parties** from later litigation about what should have been preserved.

---

**Rebuttal 9: "The documentary environment is irrelevant."**

Plaintiff does not rely on documentary narratives for any factual allegation.

References to media saturation serve only to show:

- the multiplicity of narratives,

- the instability of historical accounts, and

- the likelihood that digital records are the *only* objective evidence available.

Documentaries are cited as evidence of environment, not truth.

That distinction satisfies SDNY standards for preservation logic.

---

**Rebuttal 10: "Plaintiff is seeking discovery through preservation."**

This Notice:

- requests no production,

- seeks no third-party access,

- identifies no interrogatories,

- contains no requests for admissions, and

- seeks no substantive relief beyond stabilizing datasets.

Federal courts routinely grant preservation orders that precede or accompany discovery phases.

This filing is entirely procedural.

---

**Rebuttal 11: "Combs' criminal status or incarceration resolves or moots preservation."**

Preservation obligations **do not depend on** a defendant's custody status.

Courts routinely order preservation against incarcerated, indicted, or post-conviction defendants.

Corporate holdings, digital assets, catalog rights, and third-party contractual networks remain active irrespective of personal legal status.

Therefore, incarceration has *no legal effect* on preservation necessity.

---

**Rebuttal 12: "The requested categories are too technical."**

The categories (authorship lineage, ISRC/ISWC histories, log states, API dissemination, migration records) are:

- standard in digital-music discovery,

- routinely preserved in major-label litigation,

- directly tied to Plaintiff's claims and defenses.

Their technical nature reflects the complexity of the system, not overreach.

---

**Rebuttal 13: "This filing attempts to reach beyond the Defendant."**

The Notice expressly **refuses** to seek:

- relief against third parties,

- relief against labels,

- relief against DSPs,

- subpoenas,

- or expanded liability theories.

The structural references serve only to describe the **pathways through which Defendant's own digital catalog flows**, which is necessary to explain technical volatility.

The scope is self-contained and compliant with Rule 27 logic.

---

**Rebuttal 14: "Plaintiff is attempting to score litigation advantage."**

Preservation does not confer strategic advantage; it prevents strategic disadvantage.

It ensures the case proceeds on a complete record rather than a fragmented or altered one.

Neutrality is the purpose of preservation.

This filing seeks exactly that and nothing more.

**Rebuttal 15: "Plaintiff lacks standing to request preservation."**

Preservation requests in an active federal case do not require a separate standing analysis.

Once litigation is underway, the Court's inherent authority applies automatically, and any party may request clarification or stabilization of retention obligations.

**Therefore:** Standing is inherent to Plaintiff's status as a litigant; Defendant cannot challenge it without challenging the Court's authority itself.

---

**Rebuttal 16: "The request improperly anticipates future claims or amendments."**

Preservation does not presuppose:

- amendments,

- expanded allegations,

- or additional defendants.

It merely ensures that if the Court later permits amendment under Rule 15, the evidentiary record has not been compromised.

Federal courts routinely recognize that preservation is appropriate even when future issues are hypothetical or unresolved.

**Thus:** The request does not anticipate new claims; it protects existing ones.

---

**Rebuttal 17: "The request is speculative."**

Speculation is not the standard.

The standard is **reasonable foreseeability** of loss or alteration.

Forecasting digital volatility is not speculative; it is consistent with:

- known migration behaviors,

- routine log rotation,

- system deprecation cycles,

- catalog re-ingestion processes,

- and rights-management updates.

The risk is structural, documented, and ongoing — not hypothetical.

**Therefore:** The preservation request rests on established patterns, not speculation.

---

**Rebuttal 18: "Preservation prejudices Defendant's business operations."**

Preservation does not halt operations, freeze distribution, or impede commercial activity.

It simply requires:

- maintaining snapshots,

- suspending auto-deletion rules for specific categories, and

- flagging relevant datasets.

These are routine enterprise practices that do not meaningfully interfere with business continuity.

Courts recognize that **preservation duties coexist with normal operations**.

**Thus:** Defendant incurs no meaningful prejudice.

---

## VIII. CONCLUSION

For all the reasons stated above, including:

- structural volatility in digital music systems;

- historical and institutional narrative instability;

- multidecade catalog migrations;

- economic incentives that favor record simplification over historical precision;

- catalog fragility in recoupment-based environments; and

- the limited, non-intrusive nature of the procedural safeguard requested,

Plaintiff respectfully submits that **preservation of the identified categories of digital evidence is necessary to prevent future injustice** and to ensure that this Court may later evaluate a complete and accurate record.

Respectfully submitted,

/s/ **Joseph Anthony Reyna (JoeCat®)**

**Joseph Anthony Reyna (JoeCat®)**

Plaintiff, Pro Se

Dated: December 4, 2025

---

**SWORN DECLARATION OF JOSEPH ANTHONY REYNA**

I, **Joseph Anthony Reyna**, declare as follows:

1. I am the Plaintiff in **Reyna v. Combs, Case No. 1:25-cv-09608 (S.D.N.Y.)**.

2. I authored the foregoing document titled **"Plaintiff's Supplemental Notice Regarding Digital Evidence Preservation Under the Court's Inherent Authority and the Rule 27 Framework (No Relief Requested Beyond Preservation)."**

3. All factual statements therein regarding:

   ○ digital-system volatility;

   ○ entertainment-industry structural incentives;

   ○ metadata fragility;

   ○ catalog migration behaviors;

   ○ narrative instability patterns; and

   ○ foreseeable spoliation mechanisms

4.  are based on my personal knowledge, research, and experience as an artist, rights-holder, and public-interest advocate, together with publicly available sources, to the best of my understanding.

5.  In this filing, I do **not** allege wrongdoing by any non-party.

6.  I seek only preservation of evidence, not discovery, sanctions, or adverse inferences.

7.  I believe that certain digital evidence described in the Notice may be altered, overwritten, or lost during routine system operations before discovery can be fully conducted if clear preservation is not implemented.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **4th day of December, 2025.**

Signed electronically:

**/s/ Joseph Anthony Reyna**

**Joseph Anthony Reyna (JoeCat®)**

---

**EXHIBIT LINKS**

## Exhibit 1 – Netflix Documentary Context ("Sean Combs: The Reckoning")

Official Netflix Tudum article providing background, production context, and thematic framing for the documentary:
https://www.netflix.com/tudum/articles/sean-combs-the-reckoning-diddy-documentary-hotel-footage

---

## Exhibit 2 – Long-Form Critical Review of the Documentary

A comprehensive review from *The Independent*, mirrored through Inkl, summarizing public reporting concerning the documentary's content and reception:
https://www.inkl.com/news/sean-combs-the-reckoning-review-you-can-see-why-the-musician-is-fighting-to-ban-this-horrific-documentary

---

## Exhibit 3 – Keefe D Arrest in Relation to the Tupac Shakur Murder Investigation

Mainstream reporting from *People Magazine* documenting the arrest of Duane "Keefe D" Davis in connection with the 1996 homicide of Tupac Shakur:
https://people.com/tupac-murder-suspect-keefe-d-arrested-las-vegas-7979330

---

## Exhibit 4 – Documentary Allegations Involving Violence on Property Linked to Defendant

Reporting from *People* describing allegations raised in a separate documentary involving conduct on a yacht associated with Defendant, offered for environmental and contextual purposes:
https://people.com/multiple-women-accuse-chris-brown-of-rape-in-new-documentary-8734719

---

## Exhibit 5 – Rolling Stone Investigation Summary (as circulated via NY Post)

Article summarizing a Rolling Stone investigative report concerning allegations from Defendant's college years, included solely to show the extent of public investigative documentation over multiple decades:
https://nypost.com/2024/05/29/diddy-allegedly-whupped-college-girlfriend-with-a-belt/

---

## Exhibit 6 – Industry-Wide Crowd-Safety Failure Pattern (Astroworld 2021)

Public record detailing the 2021 Astroworld crowd crush, demonstrating structural risks within large-scale entertainment environments and the recurrence of archival/record disparities following such events:
https://en.wikipedia.org/wiki/Astroworld_Festival_crowd_crush

## Exhibit 7 – General Biographical, Commercial, and Litigation Background of Defendant

Background information regarding Defendant's career, business ventures, and timeline, included for neutral contextual reference:
https://en.wikipedia.org/wiki/Sean_Combs

## Exhibit 8 – 1991 City College Stampede (Historical Structural Liability Event)

Public documentation of the 1991 crowd crush at City College of New York, an event promoted in part by Defendant early in his career, relevant to historical narrative instability and archival issues:
https://en.wikipedia.org/wiki/1991_City_College_of_New_York_stampede

## Exhibit 9 – General Reference List of Human Stampedes and Crowd Crushes

A general reference illustrating the recurrence of crowd-safety failures across jurisdictions and decades, offered to contextualize systemic risks in large entertainment events:
https://en.wikipedia.org/wiki/List_of_human_stampedes_and_crushes

## Exhibit 10 – DOJ Archive: Historical Organized-Crime and Entertainment-Industry Adjacency Records

U.S. Department of Justice (SDNY) archive index containing historical press releases regarding money-laundering and organized-crime cases involving entities adjacent to the music industry (including the Supreme Team/Murder Inc matter):
https://www.justice.gov/archive/usao/nys/pressreleases